### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**UNITED STATES OF AMERICA,**

       **Plaintiff,**

**v.**                                         **Case No:   6:14-cv-1538-Orl-22TBS**

**DOUGLAS MESADIEU, individually
and d/b/a LBS TAX SERVICES,
MILESTONE TAX SERVICES, TAX
ADVANCE, INC., PLATINUM
CAPITAL GROUP, INC., PRINCETON
CAPITAL GROUP, INC., GALLEON
CAPITAL GROUP, INC., SANTA
MARIA GROUP, INC., and TAX AID,
LLC,**

       **Defendant.**

---

### MEMORANDUM OPINION AND ORDER

Plaintiff the United States (the "Government") filed this action seeking injunctive relief and disgorgement against Defendant Douglas Mesadieu ("Mesadieu") for alleged violations of the Internal Revenue Code. (Doc. No. 1). On March 8 & 9, 2016, the Court held a two-day bench trial. (*See* Doc. Nos. 61 & 62). Prior to trial, the Court issued a Stipulated Order of Permanent Injunction against Mesadieu. (Doc. No. 60). For the reasons that follow, the Court determines that disgorgement is an available remedy but holds that the Government has not met its burden of proving the proper amount subject to disgorgement.

### I.   PROCEDURAL BACKGROUND

This is one of several civil actions filed by the Government against a group of retail tax return preparers for allegedly violating certain sections of the Internal Revenue Code. The Complaint is voluminous, but the key allegation is that Defendant Mesadieu, through his wholly-

owned companies and his tax return preparer employees, prepared thousands of tax returns that were fraudulent in various ways. (*See* Doc. No. 1, ¶ 54). Though Mesadieu owned and operated his tax preparation stores through eight entities, he is the sole defendant in this lawsuit.[1]  In Count I, the Government seeks injunctive relief pursuant to 26 U.S.C. § 7407; in Count II, the Government seeks injunctive relief pursuant to 26 U.S.C. § 7408; and in Count III, the Government seeks injunctive relief and disgorgement of profits pursuant to 26 U.S.C. § 7402(a) as is necessary to enforce the Internal Revenue Laws. (Doc. No. 1 at pp. 78–88). On January 5, 2016, the Court issued a stipulated Order of Preliminary Injunction. (Doc. No. 47). Prior to trial, Mesadieu consented to the conversion of the Preliminary Injunction Order into that of a permanent injunction. (Doc. No. 57). Thus, there are no longer issues of fact or law to be decided with regard to Counts I & II. The Court held a bench trial March 8th through 9th, 2016 to address the only disputed issues remaining for determination: whether disgorgement is an available remedy under § 7402(a);[2] and if so, the proper amount subject to disgorgement.

## II.   FINDINGS OF FACT

In 2009, Mesadieu began his tax preparation business as a District Sales Manager ("DSM") for LBS Tax Services.[3] (Doc. No. 51 at p. 30, ¶ 8). In 2011, after two years in the managerial

---

[1] Mesadieu's entities are: LBS Tax Services; Milestone Tax Services; Tax Advance, Inc.; Platinum Capital Group, Inc.; Princeton Capital Group, Inc.; Galleon Capital Group, Inc.; Santa Maria Group, Inc.; and Tax Aid, LLC. (Doc. No. 51 at p. 29, ¶ 5). The Court is unaware whether these companies all remain in existence.

[2] In an Order denying Mesadieu's Motion for Partial Summary Judgment, the Court held that disgorgement is an available remedy under 26 U.S.C. § 7402(a). (Doc. No. 43). Despite this, Mesadieu continues to raise this issue.

[3] LBS Tax Services was a tax return preparation business that Walner G. Gachette franchised through Loan Buy Sell, Inc., a Florida corporation. Mr. Gachette is the defendant in a separate action before this Court, *United States v. Gachette*, No. 6:14-cv-1539. The parties recently stipulated to entry of a preliminary injunction in that case.

position, Mesadieu became an owner of an LBS franchise. (*Id*.) By 2013, Mesadieu owned forty-six LBS franchises. (*Id*.) Originally, Mesadieu created one company, Tax Advance Inc., to own his LBS franchises; however, as he began to franchise additional stores, he created additional companies or LLCs for each state in which he owned stores: Texas, Florida, and Georgia. (*Id*. ¶ 10). Each of Mesadieu's individual tax preparation stores is managed by a DSM. (*Id*. at p. 30, ¶ 11). In order to become a DSM, that individual must pay a fee to LBS. (Marlene Guzman Deposition (Ex. 437) at p. 22). The fee is based on different levels of "percentages"—25%, 50%, and 75%. (*Id*. at p. 23). The percentage that an individual pays to become a DSM represents the percentage of payment the DSM will receive at the end of the year based on the store's annual gross income.[4] (*Id*.) A DSM receives no hourly pay, it is based entirely on commission. (*Id*.)

Each of Mesadieu's stores operates with an Electronic Filer Identification Number ("EFIN") that is required by the Internal Revenue Service ("IRS") and serves to identify in which location a tax return was prepared. (Doc No. 51 at p. 30, ¶¶ 16–17). The EFINs are not in Mesadieu's name individually but rather are in the name of each of his companies that own the particular store. (Trial Transcript,[5] Arrington, at 11:2–14). Additionally, each individual tax return preparer that works for one of Mesadieu's stores is required to have a Preparer Tax Identification Number ("PTIN") to identify themselves with the IRS as a paid tax return preparer. (Trial Transcript, Arrington, at 13:19–14:8).

---

[4] For example, if the DSM paid the 25% level and the store's gross income was $100,000, then that DSM would make $25,000 from the store's gross income. It is unclear what the initial DSM payment is based on.

[5] The Court cites to an excerpted Trial Transcript. This excerpted Trial Transcript can be found on the Court docket. The page numbers will differ from the full Trial Transcript.

The Government's lawsuit is based on allegations that Mesadieu and his companies ran a fraudulent tax preparation business serving primarily low-income taxpayers. (Doc. No. 1). The Government contends that Mesadieu and his companies manipulated the Earned Income Tax Credit ("EITC") in order to receive the highest tax refund for its customers. (Doc. No. 44 at p. 4). An EITC is a refundable tax credit available to certain low-income individuals and is based on the taxpayer's income, filing status, and claimed number of dependents. (Doc. No. 50 at p. 31, ¶ 21). At trial, the Government submitted evidence showing that Mesadieu's companies were able to increase the EITC, and ultimately its customers' tax refunds, by using a number of tactics. Mesadieu's companies benefit from inflated tax refunds because the companies are paid by subtracting their fees from the customers' tax refunds before the customer receives it. (Trial Transcript, Allen, at 2:12–3:15). Tax refunds are issued to taxpayers via a third-party processor's bank account. (Doc. No. 51 at p. 32 ¶ 26). The third-party processor in this case, EPS Financial, is responsible for deducting and transmitting the tax return preparation fees. (*Id*. at p. 32 ¶ 27). The Government provided EPS Financial's "Fee Detail Report" comprised of all fees received by Mesadieu's companies. (Ex. 432).

At trial, the Government submitted both live and deposition testimony of over fifteen customers of Mesadieu's stores. The majority of the taxpayers were customers of Mesadieu's Florida stores, with the exception of six from Texas stores and one from a Georgia store.[6] The Government's evidence shows that one of the ways Mesadieu's companies' manipulate the EITC is to create fake businesses to list on the taxpayer's Schedule C, such as a transport services

---

[6] For Florida, *see* Exs. 53–54. 57–58, 94, 97–103, 122, 127, 150, 176. For Texas, *see* Exs. 1, 19, 22, 23, 29, 32. For Georgia, *see* Ex. 39.

business, hair salon, or barber shop. (*See* Ex. 29; Ex. 57; Ex. 102). Other times, the taxpayer's Schedule C claims losses for a business but did not list a business name. (Ex. 58). These taxpayer customers testified that no such businesses existed.[7] Another tactic is to claim false unreimbursed employee expenses on a Schedule A. For example, expenses for non-deductible commuter miles or other business-related expenses for unreimbursed meals or uniforms would be claimed. (*See* Ex. 54 at p. 15; Ex. 95; Ex. 99 at p. 8; Ex. 142 at p. 17; Ex. 150).[8] Another often-used strategy is to claim false charitable donations or education credits that the taxpayer testified he or she did not actually pay and did not tell the tax return preparer that the amounts were paid. (Ex. 54 at p. 15; Ex. 99 at p. 8; Ex. 103 at p. 13; Ex. 122; Ex. 142 at p. 17). Three tax returns submitted into evidence were personally prepared by Mesadieu and contained similar false information, such as a fake business and false education credit. (Exs. 53, 57, 58).[9]

To establish the amount of disgorgement, the Government relied on a random sampling of tax returns prepared by Mesadieu's companies. (Trial Transcript, Arrington, at p. 19). In total, for all years of tax preparation, Mesadieu's companies prepared around 13,000 tax returns. (*Id.* at 5:16–25). However, the random sample that the Government presented at trial consisted of only 230 tax returns prepared in Houston, Texas for the tax year 2012. (*Id.* at 18:19–19:1). The overall pool of tax returns from which the 230 were selected was approximately 3,600. (Trial Transcript,

---

[7] Shauna Deleon Deposition (Ex. 441) at pp. 14, 20); Trial Transcript, Dominguez, at 18–25:21; Trial Transcript, Brown, at 32:12–33:19.

[8] Trial testimony corresponding with the taxpayer customer tax returns: Trial Transcript, Huddleston, at 2:13–3:7; Trial Transcript, Dominguez, at 18–25:21; Trial Transcript, Brown, at 36:17 – 37:17; Trial Transcript, Baxter, at 10:5–11:20.

[9] Trial testimony corresponding with the taxpayer customer tax returns: Trial Transcript, Baxter, at 6:3–4; Trial Transcript, Dominguez, at 19:22–20:4; Trial Transcript, Torres, at 30:23–31:4.

Buckel, 2:12–19). Despite that 230 tax returns were selected for the random sample, only 115 taxpayers were interviewed regarding their tax returns to determine whether the information on the tax return was fraudulent. (Trial Transcript, Arrington, at 20:18–21). Those customers interviewed were not put under oath. (*Id.* at 20:16–17). From this, the Government's expert testified that the percentage of "non-compliant" tax returns[10]—meaning, a taxpayer underreports his taxes due—was 82.6%.[11] (Trial Transcript, Buckel, at 2:12–25). Additionally, it is possible that as many as 25% of the tax returns were "compliant," or correctly reported. (*Id.* at 5:2–11).

### III.   CONCLUSIONS OF LAW

#### A.  *Availability of Disgorgement Remedy*

Mesadieu again argues that disgorgement is not an available remedy pursuant to § 7402(a), despite that the Court has already rejected this argument. (Doc. No. 43). In that Order, the Court emphasized that the "[t]he language of § 7402(a) encompasses a broad range of powers necessary to compel compliance with the tax laws." *United States v. Ernst & Whinney*, 735 F.2d 1296, 1300 (11th Cir. 1984). In that Order, the Court stated:

> To the extent [the defendant] suggests that disgorgement is not an available remedy under 26 U.S.C. § 7402, he is wrong. *See F.T.C. v. Ross*, 743 F.3d 886, 890–91 (4th Cir. 2014) ("Congress' invocation of the federal district court's equitable jurisdiction brings with it the full 'power to decide all relevant matters in dispute and to award complete relief . . . .' " (quoting *Porter v. Warner Holding Co.*, 328 U.S. 395, 399, 66 S.Ct. 1086, 1090, 90 L. Ed. 1332 (1946))); *SEC v. Monterosso*, 756 F.3d 1326, 1337 (11th Cir. 2014) (per curiam) ("Disgorgement is an equitable remedy intended to

---

[10]  A non-compliant tax return is the underreporting of taxes due on the income tax return. This is also referred to as "tax harm." (Trial Transcript, Buckel, at 4:11–13).

[11]  The Government's expert is a Senior Research Analyst for the IRS. The Government's expert provided the upper and lower bounds of a 95% confidence interval as to the non-compliant tax returns: thus, she said with 95% confidence that the percentage of non-compliant tax returns from the pool of 3,600 tax returns falls between 75.7% and 89.6%. (Trial Transcript, Buckel, at 2:12–25). The Court will refer to this as the "confidence interval."

prevent unjust enrichment."); *United States v. Kahn*, No. 5:03CV436Oc10GRJ, 2004 WL 2251798 (M.D. Fla. Aug. 12, 2004) (Hodges, J.) (ordering defendants to disgorge fees and payments received from "abusive tax schemes" pursuant to 26 U.S.C. § 7402(a) and the court's "inherent equitable powers").

*United States v. Scott*, 88 F. Supp. 3d 1278 (M.D. Fla. 2015).

"Unless otherwise provided by statute, all the inherent equitable powers of the District Court are available for the proper and complete exercise of that jurisdiction." *Porter*, 328 U.S. at 399. Additionally, in cases where the public interest is involved, a district court may exercise equitable powers of "an even broader and more flexible character." *Id*. The Eleventh Circuit has adopted this reasoning in the context of section 13(b) of the Federal Trade Commission Act, 15 U.S.C. § 53(b)—a statute similar to the one at issue because it confers equitable powers upon the district court but does not expressly provide for a disgorgement remedy. *See F.T.C. v. Gem Merch. Corp*., 87 F.3d 466, 468 (11th Cir. 1996). Additionally, at least two other district courts have authorized the remedy pursuant to § 7402(a). *See Kahn*, 2004 WL 2251798; *see also*, *United States v. Antoine*, No. 14-81199-cv-MIDDLEBROOKS/BRANNON, 2016 WL 617125, at *3 (S.D. Fla. Jan. 22, 2016). Therefore, the Court finds that disgorgement in the amount of a defendant's "ill-gotten gains" constitutes a "fair and equitable" remedy as it reminds the defendant of its legal obligations, serves to deter future violations of the Internal Revenue Code, and promotes successful administration of the tax laws.

Without citing any legal authority, Mesadieu argues for the first time in his post-trial brief that his due process rights are violated by a disgorgement remedy not expressly in the statute. (Doc. No. 65 at pp. 2–3). Mesadieu does not clarify whether his argument is based on procedural due process or substantive due process. Procedural due process is not implicated because Mesadieu has already raised the issue of disgorgement and was provided a full and fair opportunity to be

heard on the issue. (*See* Doc. Nos. 41 & 43). Notably, § 7402(a) expressly provides the Court with power to "render such judgments and decrees as may be necessary or appropriate for the enforcement of the internal revenue laws." 26 U.S.C. § 7402(a). Thus, Mesadieu was certainly on notice that a district court has the power to enter a judgment against him and that tax fraud was not without monetary consequence. The Internal Revenue laws provide for both criminal and civil penalties for fraudulent conduct. *Chris-Marine USA, Inc. v. United States*, 892 F. Supp. 1437, 1452 (M.D. Fla. 1995). To the extent Mesadieu claims a violation of his substantive due process rights, he has not even identified a fundamental right that has been violated. "The substantive component of the Due Process Clause protects those rights that are 'fundamental' that is, rights that are 'implicit in the concept of ordered liberty.'" *Flagship Lake Cty. Dev. No. 5, LLC v. City of Mascotte, Fla.*, 559 F. App'x 811, 815 (11th Cir. 2014).[12] At issue is the monetary amount that Mesadieu has been unjustly enriched with by fraudulently preparing taxes. Mesadieu has no constitutional right in fraudulently obtained funds.

### B. Whether Mesadieu is a Tax Return Preparer Liable for Disgorgement

In his post-trial brief, Mesadieu argues that the IRS Treasury Regulation 1.6694-1(b)[13] provides that only one individual associated with a firm, and no other individuals, may be held liable for the same tax return. (Doc. No. 65 at p. 3). Mesadieu's argument is misplaced. First, the Court determines that Mesadieu is a tax return preparer. "[T]he statutory definition of tax return preparer is broadly written to include those who 'employ' others to prepare tax returns." *United*

---

[12] In the Eleventh Circuit, "[u]npublished opinions are not considered binding precedent, but they may be cited as persuasive authority." 11th Cir. R. 36-2.

[13] Treasury Regulation 1.6694-1 only addresses penalties applicable to tax return preparers.

*States v. Elsass*, 978 F. Supp. 2d 901, 911 (S.D. Ohio 2013), *aff'd*, 769 F.3d 390 (6th Cir. 2014) ("[A]ccordingly [the defendants] can be considered tax return preparers by virtue of the fact that they currently hire entities to complete amended tax returns for [their] customers for a fee."). Mesadieu operates tax return preparation stores that generate revenue by filing tax returns. (Doc. No. 51 at p. 32, ¶ 27). Mesadieu's employees are employed to and have completed and filed tax returns for Mesadieu's customers. (Doc. No. 51 at p. 30, ¶ 11). In some instances, Mesadieu himself completed and filed the tax returns. (Trial Transcript, Arrington, at 25:14–27:8). For these reasons, Mesadieu is a tax return preparer within the meaning of the Internal Revenue Code.

Moreover, the Court has "a broad range of powers necessary to compel compliance with the tax laws." *Ernst & Whinney*, 735 F.2d at 1300. Mesadieu should not be permitted to insulate himself from liability because he delegates responsibility for filling out the tax returns. *See United States v. ITS Fin., LLC*, 592 F. App'x 387, 397 (6th Cir. 2014). The extent of Mesadieu's violations of the tax laws are even more serious because the nature of his business operation causes more violations than an individual tax return preparer is capable of. *Id.* Therefore, the tax laws permit the Court to hold Mesadieu accountable as a tax return preparer. In any event, Mesadieu is the only individual the Government is seeking to hold liable for these returns.

### C. Amount of Disgorgement Standard

To be entitled to disgorgement, the plaintiff need only produce a reasonable approximation of the defendant's ill-gotten gains. *See S.E.C. v. Calvo*, 378 F.3d 1211, 1217 (11th Cir. 2004). "Exactitude is not a requirement; so long as the measure of disgorgement is reasonable, any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty." *Id.* Once a plaintiff presents its estimate, the burden shifts to the defendant to show that the plaintiff's estimate was not a reasonable approximation. *S.E.C. v. Lauer*, 478 F. App'x at 557. If "'a

defendant's record-keeping or lack thereof has so obscured matters that calculating the exact amount of illicit gains cannot be accomplished without incurring inordinate expense,' a court may set disgorgement at the 'more readily measurable proceeds received from the unlawful transactions.'" *Id*. There must be a "relationship between the amount of disgorgement and the amount of ill-gotten gain," and a district court may not order disgorgement of an amount obtained without wrongdoing or obtained during a period where there is no record evidence of fraud. *C.F.T.C. v. Sidoti*, 178 F.3d 1132, 1138 (11th Cir. 1999).

### D. *Whether the Government Has Met Its Burden of Proving Amount of Disgorgement*

The Court finds that the Government has proven that Mesadieu and his companies have been unjustly enriched by fraudulently inflating the EITC on the tax returns they prepared for customers in order to increase a taxpayer's tax refund. The remaining issue is whether the Government has provided a reasonable approximation of the amount of this unjust enrichment. The Government asks for a disgorgement award in the amount of $11,176,763. (Doc. No. 64 at p. 11). Relying on cases that ordered disgorgement of a defendant's gross receipts, the Government asks for the total of all fees received by Mesadieu's companies, in all three states, for the tax years 2012–2015. (*Id*.) The Court concludes that the Government has not provided a reasonable approximation of Mesadieu's unjust enrichment.

As an initial matter, the Court has not found a case similar to the one at bar where the parties' dispute the amount to be disgorged pursuant to 26 U.S.C. § 7402(a). Thus, the Court proceeds in the absence of precedent. The Government relies on cases involving violations of the federal securities laws or the Federal Trade Commission Act. (Doc. No. 64 at pp. 2–5). Mesadieu disputes their applicability. (Doc. No. 65 at pp. 14–15). These cases are distinguishable because they involve an entire fraud. In those cases, either all of the defendant's conduct was fraudulent or

the defendant's illegitimate activity is indecipherable from his legitimate activity. *See*, *S.E.C. v. Lauer*, 478 F. App'x 550, 557 (11th Cir. 2012); *see also*, *Calvo*, 378 F.3d at 1217. In contrast, in the present case, Mesadieu's tax preparation stores did not *always* prepare taxes fraudulently. In other words, some of the tax returns are correct and perfectly legal. (*See* Trial Transcript, Buckel, at 5:2–11).

A court's power to order disgorgement is not unlimited. It extends only to the amount the defendant profited from his wrongdoing. *S.E.C. v. ETS Payphones, Inc.*, 408 F.3d 727, 735 (11th Cir. 2005). Any additional sum is impermissible as it would constitute a penalty. *Id*. Some cases awarding a plaintiff the sum of a defendant's total profits or gross revenue reason that this amount is a reasonable approximation because uncertainty or impracticality prohibits a more precise calculation. *Lauer*, 478 F. App'x at 557; *Calvo*, 378 F.3d at 1217 ("Any further apportionment would have been impractical in light of the inadequate documentation and the complex and heavily-disguised transactions employed in this scheme."). In the context of false advertising or illegal telemarketing, courts have increasingly awarded net revenue; however, those cases involve profits from a fraudulent scheme where it is similarly impractical to distinguish the defendant's illegitimate gain from a legitimate one. *See, e.g.*, *F.T.C. v. Leshin*, 618 F.3d 1221, 1237 (11th Cir. 2010) (requiring the contempt defendants to disgorge all fees collected on contracts procured in violation of an injunction); *F.T.C. v. Direct Mktg. Concepts, Inc.*, 624 F.3d 1, 4 (1st Cir. 2010) (ordering disgorgement of all proceeds received from customers due to false advertising scheme utilizing infomercials); *F.T.C. v. HES Merch. Servs. Co.*, No. 6:12-cv-1618-Orl-22KRS, 2015 WL 916349, at *1 (M.D. Fla. Feb. 11, 2015) (the Court ordered disgorgement of net revenue from telemarketing scam that was entirely fraudulent).

The Government submitted some of the tax returns filed by Mesadieu's companies from IRS internal records.[14] Therefore, presumably, there are records of the tax returns available, and the Government has shown it is capable of determining which of the tax returns are non-compliant or fraudulent. Additionally, the Government has records of all fees that Mesadieu's companies received. (*See* Trial Transcript, Arrington, at 4:10–15; Ex. 432). Though it certainly takes time to review all 13,000 tax returns, it is not an "inordinate expense" or impractical. The proper amount of disgorgement is not incapable of being determined. The Government is capable of providing the Court with a reasonable approximation of those fees paid to Mesadieu's companies for fraudulent tax returns—or at least non-compliant tax returns—prepared in all states and in all years in which it seeks disgorgement. In light of this, the Court finds that the Government's approximation of $11 million as the amount of unjust enrichment is unreasonable.

As the Court has determined that a disgorgement award of gross receipts is not a reasonable approximation, the Court must next consider the Government's argument that the estimated percentage of non-compliant tax returns from the Texas sample is a sound methodology for separating illegal proceeds from legal ones. (Doc. No. 64 at p. 15). Under this method, the Government asks the Court to utilize the confidence interval of the non-compliant tax returns (73%–91.7%) to calculate Mesadieu's companies' illegal proceeds. To clarify, the Government urges the Court to use this percentage derived solely from the Texas sample of 2012 tax returns and apply it to the total gross profits of Mesadieu's companies from its operations in all three states and for tax years 2013, 2014, and 2015.[15]  (*Id.*)

---

[14] *See, e.g.*, Exs. 1, 12, 22, 23, 29, 32, 39, 53–54. 57–58, 94, 97–103, 122, 127, 150, 176.

[15] Specifically, the Government asks the Court to use the middle of the confidence interval, 82.4%, and order disgorgement of $9,209,652.71. (Doc. No. 64 at p. 15).

For a number of reasons, Mesadieu contends that this is not a reasonable approximation of illegally-obtained revenue. First, Mesadieu argues that the sample is flawed because the pool of tax returns the Government used was only the Texas returns for the 2012 tax year, which was a mere 3,600 of the total 13,000 tax returns. (Doc. No. 65 at p. 5). Thus, the Government's sample incorrectly presumes that all stores in Texas, Florida, and Georgia followed the same procedures in all four years. (*Id*.) Additionally, Mesadieu emphasizes that the tax returns in that sample labeled "non-compliant" could receive this designation for reasons other than tax fraud: for example, a mistake by the tax return preparer or the taxpayer, or the taxpayer providing incorrect information. (*Id*). Mesadieu also argues that the total of the fees received for tax return preparation was shared by the DSM's that were paid based solely on commission from those fees. (*Id*. at p. 8). Therefore, Mesadieu, individually, was not unjustly enriched by the entire amount. (*Id*.)

The Court finds it is unreasonable to approximate the total disgorgement award in this case based on a sample limited to one tax year and one geographical area. Utilizing a random sample from a pool of only 3,600 tax returns to make a conclusion about 13,000 tax returns is not reasonable. There are approximately 9,400 tax returns that were inevitably not capable of selection. The Government's sample provides no information as to the percentage of non-compliant tax returns in other years or in other states. The Government's expert testified only as to the soundness of the sample methodology for the pool of 3,600 tax returns from which the sample was selected. (*See generally*, Trial Transcript, Buckel, at pp. 1–5). Importantly, the Government's expert testified that the sample data provides no information on whether the compliance rate from that sample is the same in other years. (*Id*. at 5:12–15). Accordingly, the Court finds that this sample is not generalizable to the universe of 13,000 tax returns.

At trial, the Government presented witnesses that were customers of Mesadieu's Florida stores.[16] These witnesses provided testimony that evidences a similar pattern of fraud as that described above. However, the Government selected these customers as witnesses because of their fraudulently prepared tax returns. Their testimony does not provide the Court with a reasonable approximation of the total number of tax returns in Florida that were fraudulently prepared or the total amount Mesadieu's companies received from their illegal conduct.

Lastly, the Government argues that Mesadieu and his companies are jointly and severally liable for the fraud because Mesadieu is the sole owner of the companies and uses his companies as a vehicle for fraud. (Doc. No. 64 at p. 4). Yet, the Government did not join a single one of Mesadieu's companies as a Defendant. Rather, the Government sued "Douglas Mesadieu, individually and d/b/a LBS Tax Services, Milestone Tax Services, Tax Advance, Inc., Platinum Capital Group, Inc., Princeton Capital Group, Inc., Galleon Capital Group, Inc., Santa Maria Group, Inc., and Tax Aid, LLC." (Doc. No. 1). Mesadieu is the only Defendant that was served with process. (Doc. No. 3). A designation of "d/b/a" or "doing business as" is a designation to be used when the name following the d/b/a designation represents a fictitious name in which an individual or entity conducts business. *See Mastro v. Seminole Tribe of Fla.*, 578 F. App'x 801, 803 (11th Cir. 2014) (reasoning that "doing business as" is used as "merely a fictitious name with no independent existence."). Notably, a "d/b/a" designation standing alone is not sufficient to join an independent entity as a defendant in a lawsuit. *See Schraubstadter v. United States*, 199 F. 568, 571 (1912) ("The very statement ["doing business"] shows an intendment to indict the defendants personally, and not the firm as a firm."); *see also*, *Macias v. King*, No. 3:10-cv-142-ECR-RAM,

---

[16] *See, e.g.*, Exs. 53–54. 57–58, 94, 97–103, 122, 127, 150, 176.

2010 WL 5136152, at *3 (D. Nev. Dec. 6, 2010) ("In this case, Plaintiff does not name . . . the partnership itself. Instead, she sues King doing business as CNT. Thus, the alleged partnership is not a defendant . . . ."); *Mytee Prods, Inc. v. H.D. Prods., Inc*., No. 05cv2286 R(CAB), 2007 WL 1813765, at *3 (S.D. Cal. June 22, 2007) ("doing business under another name does not create an entity distinct from the person operating the business."). Had the Court determined that the Government established a reasonable approximation of the amount subject to disgorgement, the Court questions whether it would have had jurisdiction to order disgorgement of revenue obtained by Mesadieu's companies—entities that are not before the Court.

## I.   CONCLUSION

To summarize, the Government has simply not met its burden of providing enough information for the Court to reasonably approximate the amount of unjust enrichment. Though the burden is light, a reasonable approximation is still required. The Court finds it unreasonable to ask for $11 million in gross profits from an individual defendant, without joining in the lawsuit the companies that owned the tax preparation stores, and without providing a spreadsheet or some other approximate calculation of the unjust enrichment for all tax years. The Court is not permitted to order disgorgement of an amount obtained without proof of wrongdoing. *Sidoti*, 178 F.3d at 1138.

Therefore, based on the foregoing, it is **ORDERED** as follows:

1. The Court finds in favor of the Plaintiff, United States of America. Accordingly, the Clerk is **DIRECTED** to enter judgment for the Plaintiff.

2. The Order of Permanent Injunction (Doc. No. 60), issued on March 7, 2016, remains in full effect. The Court retains jurisdiction to enforce the Permanent Injunction.

3. The clerk is **DIRECTED** to close this case.

**DONE** and **ORDERED** in Chambers, in Orlando, Florida on April 12, 2016.

ANNE C. CONWAY
United States District Judge

Copies furnished to:

Counsel of Record
Unrepresented Parties